Raymond Gorczynski, Minor, by Anna Szczepanski, Mother and Next Friend, Appellee, v. Frank Nugent et al., Defendants. Washington Park Jockey Club and Arlington Park Jockey Club, Inc., Appellants.

Gen. No. 44,287.

64

Opinion filed June 23, 1948. Rehearing denied July 9, 1948. Released for publication July 12, 1948.

Vogel & Bunge, of Chicago, for apellants; L. H. Vogel, George C. Bunge and Robert L. Howard, all of Chicago, of counsel.

John H. Gately and Phillips & Suekoff, all of Chicago, for appellees; John Gannon, of Chicago, of counsel.

Mr. Presiding Justice Burke delivered the opinion of the court.

Raymond Gorczynski, a minor, filed a complaint in the circuit court of Cook county against Frank Nugent, Mrs. Elizabeth Nugent, Washington Park Jockey Club, a corporation, and Arlington Park Jockey Club, Inc., a corporation, for damages because of injuries suffered when he was kicked by a horse on July 26, 1945. A trial resulted in a verdict against the four defendants

for $35,000. Motions by the respective defendants for a directed verdict, judgment notwithstanding the verdict and for a new trial were denied and judgment was entered on the verdict. The corporations have appealed. When we speak of the defendants, we refer to the corporate defendants. Plaintiff was injured at about 9:50 a.m. on Thursday, July 26, 1945. He was then 13 years of age. He was walking or grazing a race horse named Play Grier, owned by Mrs. Elizabeth Nugent, on a plot of ground near the stables, but outside the race track enclosure at the Washington Park race track near Homewood, Illinois. The plot of grass where the mishap occurred was on the northeast part of the grounds, parallel and adjacent to Halsted street, and is a part of the stable area. There is a continuous wire fence around the entire property, including the stable area, and another fence dividing the stable from the race track enclosure, which includes the race track, grandstands, club house and administrative building.

When a race horse has had a workout or has raced he is called a "hot" horse, and it is necessary to walk him around with a halter for an hour or so to cool him off. There was testimony that in the latter part of June 1945 after the school in Harvey which plaintiff attended closed for the summer, he got a job walking horses for Mr. Nugent, the trainer for Mrs. Nugent, who owned the horses; that there were other boys working around the stables; that Mr. Nugent paid plaintiff at the rate of 50 cents a horse; that thereafter he regularly walked horses for the Nugents; that no one saw the occurrence; that plaintiff did not remember what happened; that a member of the race track police force saw plaintiff grazing the horse around 9:30 a.m. on July 26, 1945; that the next time he saw plaintiff he was lying on the ground; that the track station wagon with a stretcher in it arrived and the crew thereon picked up plaintiff, who was unconscious with a wound in his forehead; that another boy who

was also walking a horse for the Nugents saw plaintiff standing there holding the horse which was cropping grass; that as he turned around he heard a horse running, looked back and saw plaintiff lying on the ground; and that he immediately called for assistance. Plaintiff was taken to St. James Hospital at Chicago Heights and subsequently to the Little Company of Mary Hospital, in Chicago, where he was operated on and was attended by Doctors Aron and Zeiss. Mr. Nugent testified that he employed plaintiff to walk horses shortly before the occurrence; that he owed him either $17 or $18 for such work at the time of the mishap; that he gave plaintiff's mother $20 at the hospital; and that the Horsemens' Benevolent Association, an organization of owners of race horses, paid plaintiff's hospital and doctor bills.

Defendants maintain that they did not violate sec. 1 of the Child Labor Act, (par. 17, ch. 48, Ill. Rev. Stat. 1945) on which plaintiff's case is based. This section reads: "No minor under the age of fourteen years shall be employed, permitted or suffered to work at any gainful occupation in, for or in connection with any . . . place of amusement . . . within the State." They argue that at the time of the mishap plaintiff was not employed in, for or in connection with a place of amusement. They concede that the term "place of amusement" applies to the race track enclosure which contains the race track, club house, grandstands and paddock. There is no evidence that plaintiff was ever admitted to this enclosure. When he was injured he was walking a horse in the stable area, which was physically segregated from the race track enclosure by a cyclone wire fence. Defendants state that the stable area is not a place of amusement; that it is a place where horses are stabled and cared for; that it is connected with the race track only in the sense that it is in proximity thereto; that from a functional point of view the horses might as well be stabled

and cared for at another location; and that the work performed by the plaintiff, namely, the walking or grazing a horse at 10:00 a.m. was not designed to amuse anyone and had no connection with the amusement of the patrons of the race track.

The rules of the Illinois Racing Board provide that any horse racing at a licensed meeting must be stabled within the confines of that track, with a proviso that in case of necessity a horse may be stabled within the confines of an adjacent Illinois race track, or any other location approved by the board. The defendants could not conduct horse races without horses. In order to interest owners and trainers to enter their horses for the race meetings it is necessary to provide facilities for stabling and caring for the horses. These facilities were provided by the defendants. It is also necessary to furnish space in which a "hot" horse can be walked. We find that the stable area is an integral part of defendants' entire race track plant, and that when plaintiff was injured in the stable area he was working in, for or in connection with a place of amusement.

Defendants also insist that plaintiff was not working at a gainful occupation, citing *Scott v. Freeport Motor Casualty Co.,* 392 Ill. 332, and 46 C. J. 897. The *Scott* case involved the construction of an insurance policy. In our opinion it is not helpful in the construction of sec. 1 of the Child Labor Act. Walking "hot" horses is necessary in the operation of a race track. Plaintiff walked horses at this track since the latter part of June. At the time of the occurrence he was being paid every two weeks. The Nugents owed plaintiff $17 or $18 at the time of the mishap and Mr. Nugent gave plaintiff's mother $20 at the hospital. We are satisfied that at the time of the occurrence plaintiff was working at a gainful occupation in, for or in connection with a place of amusement

We turn to a consideration of defendants' assertion that the illegal employment of plaintiff was not permitted or suffered by them. The racing enclosure and the stable area are surrounded by a fence and are also separated from each other by a fence. There are a number of entrances to both the stable area and the race track enclosure, as well as a number of pass gates between them. Defendants employed a police force in the entire area to maintain discipline and order, to direct traffic and to fulfill and comply with the rules and regulations of the Racing Board and the law. State police officers were also on duty. Defendants permitted the owners of race horses who had obtained licenses from the racing commission and who desired to race at the track to keep their horses in stables at the track during a race meeting without charge. A prerequisite to such permission was the filing by the owners of an application and a so-called "Badge List and Registration" containing a list of his licensed employees, for whom badges authorizing admission to the race track enclosure were required. The names of the employees listed by the owner were checked against the licenses issued by the Illinois Racing Board before badges were issued to them. The purpose of the badges was to enable the owner and his licensed employees to enter the racing enclosure without paying an admission charge or tax. The badge list filed by the Nugents, along with their application, was introduced in evidence. Plaintiff was not a licensed employee of the Nugents and his name was not included in the list turned over to the defendants. Mr. Nugent did not regard plaintiff as a "permanent" employee. It was the practice of the defendants to open both the race track proper and the stable area to the general public up to 11:00 a.m. of each day upon which races were held. There were between 1,000 and 1,100 horses stabled at the track belonging to various peo-

ple who had brought them there to attend the meeting, and around 8,000 people as owners or employed as trainers, grooms, veterinarians, etc., entered the stable area daily. Defendants also employed a clean-up crew of boys under 16 years of age for whom employment certificates had been issued, who worked during the school vacation. All of these people, as well as the general public, were permitted to enter any part of the grounds and to pass freely through the grounds from the time the gates were opened between 4:30 and 5:00 a.m. to 11:00 a.m. At 11:00 a.m. guards were placed at the turnstiles and ushers and guards went through the racing enclosure and collected admission tickets or tax free badge coupons from everyone there, and from that time until the racing was over, admission tickets or tax free badges were required for admission to the racing enclosure. All owners and trainers of horses hired their own employees. The track had nothing to do with their employment and made no contribution toward their salary or to the government on social security, etc., and had no right to discharge them.

A track policeman who had been discharged after the mishap testified that he had seen plaintiff and other boys around the stables for approximately two weeks. Defendants state that no attempt was made to show that they knew that plaintiff was under the age of 14 years, or had any reason to believe that he was illegally employed for compensation by the Nugents, and that there was nothing in the presence of plaintiff on the premises to indicate either that he was under 14 years of age, or that he was illegally employed by anyone. The former track policeman also testified that there were two or three boys about the same size as plaintiff working there at the time, who seemed to be companions of plaintiff and that these boys were walking "hot" horses.

Plaintiff was seen day after day within the stable enclosure and no effort was made to determine

whether he had credentials. He was never required to show credentials to the gateman to gain admission to the stable enclosure. Police officers of the defendants were assigned to patrol the stable area. The boys came to the gate at about 5:00 a.m. The jury could reasonably find from the evidence and legitimate inferences that the policemen and gatemen employed by defendants knew of and permitted the practice of youngsters of the age of plaintiff to enter the track for the purpose of going to the stables to walk "hot" horses. Racing is under the supervision of the Illinois Racing Board, which has authority to prescribe rules, regulations and conditions under which horse races may be conducted, to license race track associations and to grant, refuse, suspend or withdraw licenses to horse owners, trainers, jockeys, agents, apprentices, grooms, stable foremen, exercise boys, veterinarians, valets and platers. The board also has authority to appoint or affirm the appointment of stewards; to compel the discharge of any employee of a licensee who fails to comply with the rules and regulations; and in general to supervise the conduct of all horse race meetings. The stewards have general supervision over owners, trainers, jockeys, grooms and all other persons attendant on horses. There are three stewards, one of whom is designated by and known as the steward representing the Racing Board. The other two stewards are required to be approved by the Racing Board. The stewards, when acting officially, are known as the Board of Stewards. Should the stewards disagree, a majority vote decides any question to which their authority extends. The defendants could have stopped the employment of plaintiff by threat of fine or suspension by the stewards. Paragraphs 319, 320 and 321 of the Rules, Regulations and Conditions of the Racing Board read as follows:

"319. Watchmen and policemen so employed shall be individually responsible for the certain part of the stable enclosure where they are on duty and shall im-

mediately investigate and report the presence of anyone during the night or day who may be within said stable enclosure without possessing proper credentials. A letter of instructions to all watchmen and policemen shall be addressed to each of them by the Race Track Association covering fully their duties and their strict obligation to keep stable enclosures free from outsiders and hangers-on, and a copy thereof furnished to the Illinois Racing Board.

"320. All such stable enclosures must be properly fenced, and admission granted only on proper license or credentials actually shown to the gateman.

"321. Any trainer, owner or stable foreman or others who harbor anyone not so provided with credentials shall be immediately reported to the Stewards of the meeting so that they may make investigation thereof and report the facts to the Illinois Racing Board."

The leading case construing sec. 1 of the Child Labor Act is *Purtell v. Philadelphia & Reading Coal & Iron Co.*, 256 Ill. 110. Both parties cite this case, which was a suit against the owner of a coal yard by a minor under the age of 14 years employed there as a water boy by certain of the owner's employees. The declaration contained three counts, the first based on negligence and the other two on a violation of sec. 1 of the Child Labor Act. The court sustained a judgment for plaintiff, holding that the evidence showed defendant to be liable under all counts. With respect to liability under the second and third counts, the court said (117):

"The object of this statute was to prevent absolutely the employment of children under the age of fourteen years in the occupations named therein, and a construction should be given which will effectuate that purpose, if it can be done consistently with the wording of the statute. (*American Car Co. v. Armentraut*, 241 Ill. 509.) Those who are liable under it

are bound, at their peril, to see that children are not employed contrary to its provisions. (*Strafford v. Republic Iron Co.*, 238 Ill. 371; *Beauchamp v. Sturges & Burn Manf. Co.*, 250 id. 303.) To put the construction on this statute contended for by counsel for the appellant would leave the words 'permitted or suffered to work' practically without meaning. It is the child's working that is forbidden by the statute and not his hiring, and while the statute does not require employers to police their premises in order to prevent chance violations of the act, they owe the duty of using reasonable care to see that boys under the forbidden age are not suffered or permitted to work there contrary to the statute. A person is liable if, contrary to the provisions of the statute, a child under age is employed by him, either directly or through an agent, officer or employee, and without regard to whether such employment is an intentional or willful violation of the statute. (*Beauchamp v. Sturges & Burn Manf. Co.*, *supra; People v. Taylor*, 192 N. Y. 398.) The coal pushers who hired appellee were servants of appellant and were entirely under its control. The latter had the right to order its employees to hire no boys under lawful age to carry water, and to enforce obedience of such order. This construction is consistent with that put upon similar statutes in other jurisdictions. *State v. Shorey*, 48 Ore. 396; *Inland Steel Co. v. Yadinak*, 87 N. E. Rep. (Ind.) 229; *Iron and Wire Co. v. Green*, 108 Tenn. 161.''

We agree with defendants that there is an' obvious difference between the *Purtell* case and the case at bar, in that the Nugents were not employees of defendant. However, we disagree with their contention that the Nugents were not under their control. Defendants say that there were hundreds of other horse owners occupying these stables and thousands of people passing in and out of the stable area and performing vari-

ous tasks in connection with the care of the 1,100 horses stabled there, and that it would be impossible to ascertain the age and activities and employment status of all of the thousands of people who were admitted daily to the stable area. In the *Purtell* case the minor was employed by employees of the defendant to perform necessary work for the benefit of defendant, pursuant to a long-established custom. Defendants state further that the net effect of an adverse ruling would be to make them responsible for any violation of the Child Labor Act committed by any of the 8,000 horse owners and others who were permitted access to the stables, even though such violations were utterly unknown to them, to the same extent as though defendants had employed the boys and committed the violations themselves, and that this is not the intent or meaning of the Child Labor Act. Defendants are corporations and their knowledge and acquiescence in the occupation of plaintiff and other boys in walking horses in the stable area must necessarily be derived from their agents and servants. The Horse Racing Act and the rules adopted by the board require a close supervision of all employees and activities in the racing plant, including the stable area. The jury had a right to find that defendants through their police force and other employees had knowledge that boys under 14 years were walking "hot" horses in the stable area.

The fact that hundreds of horses and thousands of people were in the stable area, or passing through, or performing tasks in the stable area, does not impress us as a factor in support of defendants' argument. The operation of a large establishment such as defendants' plant requires a commensurate number of police and other employees for the protection of all concerned. The *Purtell* case states that the statute does not require the employers to police their premises in order to prevent chance violations of the act. The record in the instant case does not show that

the employment of plaintiff was a chance violation of the act. We find that defendants suffered and permitted plaintiff to work at the gainful occupation of walking "hot" horses in a place of amusement, contrary to the statute, as a result of which he was injured.

Defendants urge that they exercised due care, citing the *Purtell* case. They state that there is no evidence that they failed to use reasonable care in any respect; that on the contrary the record affirmatively shows the track employed a police force and many other attendants for the purpose of maintaining order and discipline and to report the violation of any rule of the Illinois Racing Board or of the laws; that no report or complaint has ever been made of any employment of any boys under the age of 14 years by anyone anywhere about or upon the defendants' premises; and that all persons and activities on the premises, including those of plaintiff, the Nugents and the defendants, were under the direct supervision and custody of the stewards appointed under the Racing Act, who maintained an office on the premises, and whose duty it was to make constant inspections and to insure compliance with the regulations and the law. We have held that the employment of plaintiff was not a chance violation of the act. Defendants had adequate power and authority to prevent the violation and could have secured the revocation of the licenses of the trainer and stable foreman. The gate attendants and policemen were agents and employees of defendants. None of them saw fit to stop plaintiff when he entered the plant in the early morning. He was seen attending horses on the premises. The jury was justified in believing that it was accepted practice to permit boys of any age to enter and work as walkers of "hot" horses on defendants' premises. Two of the three stewards were appointed by defendants. Our view is that defendants are presumed to have notice of all knowledge and information acquired, or which could, by the exercise of

reasonable care, have been acquired by the stewards. Under this point defendants state that they cannot be liable upon any theory of negligence. We do not understand that plaintiff is proceeding on the theory of negligence. The complaint is based on the violation of sec. 1 of the Child Labor Act. The discussion of the subject was introduced by defendants in their brief wherein they argue that they exercised due care. In his brief plaintiff asserts that defendants failed to exercise due care. We recognize the distinction between a case based on a violation of a statute and one based on common-law negligence.

Defendants point out that the court should have directed a verdict in their behalf on the ground that there is no evidence whatever that they knew plaintiff was employed in violation of the Child Labor Act; that there is no showing of any negligence; that plaintiff was not working in any gainful occupation; and that the area where the mishap occurred was not a place of amusement. We cannot agree with defendants that the court should have directed a verdict in their favor. Defendants complain of instruction 6 given at the instance of plaintiff, which reads:

"If the jury believe from a preponderance of the evidence that the defendants, Washington Park Jockey Club and Arlington Park Jockey Club, Inc., were operating a place of amusement and that the defendants, Washington Park Jockey Club and Arlington Park Jockey Club, Inc., negligently and knowingly permitted or suffered the plaintiff to work therein at a gainful occupation, or in case the jury believe from a preponderance of the evidence that the plaintiff worked on the premises of defendants, Washington Park Jockey Club and Arlington Park Jockey Club, Inc., in such manner and for such time that by use of reasonable care defendants, Washington Park Jockey Club and Arlington Park Jockey Club, Inc., would have known thereof in time before the injury by reasonable

care to prevent the plaintiff from so working there, and that by reason thereof the plaintiff was injured, and that the plaintiff was then and there a child under the age of fourteen years, then the jury should find the defendants, Washington Park Jockey Club and Arlington Park Jockey Club, Inc., guilty.''

Defendants state that this is a mandatory instruction which directs the jury to find them guilty if they find the facts therein specified; that it is a double instruction; that the first part of the instruction says, in substance, that if the jury find that defendants ''knowingly permitted or suffered the plaintiff to work'' in a gainful occupation in a place of amusement operated by them, the jury should find these defendants guilty; that the second half of the instruction states, in the alternative, that the jury should also find these defendants guilty if they knew or in the exercise of reasonable care could have known that plaintiff was working on their premises, and could have prevented him from working there; that this is not the point; that the question is whether they suffered or permitted his illegal employment; that to prove that they suffered or permitted such illegal employment plaintiff must prove knowledge that plaintiff was under 14 and was working at a ''gainful occupation''; also that defendants have the power and right to prevent the employment of a child by the Nugents; and that the instruction is also erroneous in that it does not require any finding that the injury was the result of the employment.

We have pointed out that defendants knew or could have known that plaintiff was under 14 years of age, was working at a gainful occupation, and that they had the power and right to prevent the employment. Plaintiff's instruction 6 is not precisely worded, but we do not believe that the giving of it was erroneous. If defendants knew, or could by the exercise of

reasonable care, have known that plaintiff was working on their premises, and were not exercising such care, it follows that in such event they are deemed to have suffered or permitted his employment upon their premises. Defendants' instruction 13 told the jury that to find for plaintiff they must first find that the injuries, if any, were directly and proximately caused by his employment by the Nugents. Defendants' instruction 12 informed the jury that before plaintiff can recover against them he must prove by a preponderance or greater weight of the evidence each of the following propositions: 1. That he was under 14 years of age; 2. that on July 26, 1945 he was working at a gainful occupation in, for or in connection with the Washington Park Race Track; 3. that as a direct and proximate result of such work he suffered the injuries complained of; 4. that the defendants knew or in the exercise of ordinary care could have known that the plaintiff was doing such work; 5. that the defendants had the power and right to prevent the employment of plaintiff; and 6. that with knowledge of such employment defendants permitted and suffered such employment. The jury was told in that instruction that if plaintiff failed to prove each and all of the "foregoing" propositions by a preponderance of all the evidence, or if they failed to prove any one of them, they should find the defendants not guilty. In our opinion defendants were not prejudiced by any of the instructions that were given to the jury.

Finally, defendants insist that the damages awarded are excessive. Plaintiff received a compound comminuted depressed skull fracture of the right frontal orbit. An emergency operation was performed on the night of the injury while plaintiff was in a comatose state. A portion of the frontal bone over the orbit of the eye was removed. Several smaller pieces of bone were also removed from the fractured

area in order to relieve the pressure on the brain, which had been damaged quite a bit by coagulated blood, dirt, and the pressure from bone fragments. Plaintiff also suffered damage to the brain tissue. He was discharged from the Little Company of Mary Hospital on August 25, about one month after the occurrence, and his attending physician continued to see him at the Washington Park Hospital for about a week or 10 days. After this plaintiff made several trips to the Little Company of Mary Hospital for re-dressing. Dr. Aron testified that at the time of the operation the prognosis was grave, but that the boy gradually improved and responded to the medication given. Plaintiff's mother testified that her son was a normal, healthy and good boy prior to the occurrence; that he had trouble with soiling in 1940, but that he was pronounced cured at that time by Dr. Vander Veer; that this mishap brought about a recurrence of the soiling; that in addition her son had started to smoke, drink, fight, play hookey from school and hang around pool rooms; that since the occurrence he has been in the habit of lying to her; and that he is generally disobedient. The record discloses that plaintiff was kept back a half year in school in 1940 on doctor's orders; that he had never failed any grade prior to 1945; and that he had not failed any grade since the occurrence. Plaintiff testified that after the occurrence he could not concentrate; that he experienced almost daily headaches lasting 5 to 10 minutes; that his right eye blurred when he read more than 10 or 15 minutes; that occasionally he had a funny, sleepy feeling all day long; that he stopped soiling about one year before the occurrence; that he took an occasional cigarette prior to the occurrence; and that he had not taken any liquor or played hookey from school before the occurrence. Another witness, the Mother Superior of the grade school attended by plaintiff, testified that

he was uncertain, indifferent and nervous when he returned to school in September of 1945; that she personally had no difficulty with him in regard to discipline; that she had reports about him relative to trouble which he had with children on the playground; and that she had taken these complaints up with him.

Medical testimony was offered regarding the plaintiff's behavioral difficulties following the occurrence. Two psychiatrists testified as to their opinions in response to hypothetical questions. They stated that there might or could be a direct causal connection between the injury and the behavioral difficulties that followed and that plaintiff would require further medical treatment and supervision. Dr. Vander Veer, a child psychiatrist, examined and treated plaintiff for fecal incontinence in 1940. He saw plaintiff for psychiatric interviews about 40 times in 1940 and 1941 and once in 1943 and he diagnosed plaintiff's difficulty as neurotic soiling. Plaintiff suffered a serious injury. The court will hesitate to disturb a jury's verdict on the question of damages in a personal injury case. Under the record in this case we cannot find that the damages awarded are excessive. For the reasons stated the judgment of the circuit court of Cook county is affirmed.

*Judgment affirmed.*

KILEY and LEWE, JJ., concur.